NU–LIFE CONSTRUCTION
CORP., Plaintiff,

v.

BOARD OF EDUCATION OF the CITY OF NEW YORK, Division of School Buildings of the Board of Education of the City of New York, Stuart Horowitz, Stanley W. Dobrowolski, John Trapanotto, John J. Manfredi, John Frisone, Nicholas E. Borg, and Does 1 through 20, Defendants.

No. CV–86–0807 (ADS).

United States District Court,
E.D. New York.

Nov. 14, 1992.

---

172

See also 795 F.Supp. 602.

Kantrowitz and Goldhammer, P.C. by Gary S. Graifman, Chestnut Ridge, NY, for plaintiff.

O. Peter Sherwood, Corp. Counsel, by John P. Woods, James Joyce, and Susan Finkenberg, New York City, for Bd. of Educ.

Stanley F. Dobrowolski, defendant pro se.

Peltz, Walker & Dubinsky by Eliot Clauss and Ann M. Hetzel, New York City, for defendant John Trapanotto.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

The plaintiff, Nu–Life Construction Corp. ("Nu–Life"), in its Fourth Amended Complaint, alleged that it sustained damages resulting from the violation of its civil rights under "42 U.S.C. § 1983, et seq" (Fourth Amended Complaint, at ¶ 1). The defendant, Board of Education of the City of New York, which encompasses the Division of School Buildings of the Board of Education of the City of New York, moves for an order dismissing Nu–Life's complaint, pursuant to Fed.R.Civ.P. 12 or for summary judgment in its favor, pursuant to Fed.R.Civ.P. 56.

## FACTUAL BACKGROUND

Nu–Life was in the building, construction, and maintenance business. Between February 1984 and June 1984, Nu–Life was awarded three contracts with the Board of Education's Division of School Buildings ("DSB") to provide construction and maintenance services to three separate schools. The DSB is a subdivision of the Board of Education of the City of New York ("Board") and is charged with the responsibility of supervising construction and maintenance of the approximate 1,000 school buildings in the five boroughs of the City of New York.

The three contracts awarded to Nu–Life involved performing work at Public School 100 ("P.S. 100"), Public School 132 ("P.S. 132"), and Junior High School 126 ("J.H. 126"). Each school is located in Kings County.

Nu–Life contends that from the outset of its business relationship with the Board, it was harassed and subjected to extortion by employees of both the DSB and the Board, including General Building Inspector Stanley Dobrowolski ("Dobrowolski"), Field Inspector John Trapanotto ("Trapanotto"), their supervisor, Area Manager David Krugman ("Krugman"), and Executive Director of the DSB, Nicholas Borg ("Borg").

Nu–Life asserts that there was a widespread practice of extorting money from independent contractors that were awarded contracts by the Board. Inspectors were alleged to have sought "kickbacks" from the contractors to ensure that all their work was approved, paid for, and to ensure that they would receive extra work and future contracts. According to Nu–Life, if a contractor refused to make such a kickback, additional work and payment for work completed was withheld.

Nu-life further contends that this kickback scheme was so institutionalized that set percentages existed for various types of work. For example, it was alleged that two (2) percent of a contract was required to be "kicked back" to inspectors for all work approved for payment and ten (10) percent was expected on all extra work necessary or reasonably required to complete the job. In addition, inspectors demanded twenty-five (25) percent of the cost of all "unnecessary extra work." Such extra work made an existing contract more lucrative than contemplated and was assigned to the contractors at the sole discretion of the individual inspector.

On or about February 27, 1984, Nu–Life commenced work at P.S. 100. Nu–Life asserts that shortly thereafter, Trapanotto met with Anthony Damigos, an employee of Nu–Life and father of Paul Damigos, the principal stockholder and officer of Nu–Life. Nu–Life asserts that Trapanotto explained the kickback scheme and made a demand for money. Anthony Damigos rejected this demand. He was then told by Trapanotto that to do so "was a big mistake." On or about March 17, 1984 Nu–Life demanded payment from the Board for work performed and requested an informal hearing with Board officials to dis-

cuss Trapanotto's comments (A. Damigos Depo. p. 382).

On March 19, 1984, at an informal meeting with Dobrowolski, Nu–Life alleged that Dobrowolski refused to approve payment and threatened that he would "sit on" all payments due Nu–Life for weeks and then finally disapprove them, unless Nu–Life cooperated with the inspectors and accede to their demands for money. After this meeting, Nu–Life immediately complained to Krugman, the area manager, and requested that the problem be brought to the attention of Executive Director Borg. Krugman told Anthony Damigos not to go to Borg and that he would resolve the situation. A few days later, after Nu–Life submitted a new payment application, Nu–Life's cost breakdown and payments were approved (A. Damigos Depo. pp. 411–12, 480–82).

Nu–Life further alleges that in June 1984 Dobrowolski also demanded kickbacks in the same percentages previously requested by Trapanotto.

Disputes arose between Nu–Life and the DSB as to the quality of Nu–Life's work with regard to the three contracts at issue. As early as March 7, 1984, prior to Nu–Life's complaints of extortion, Nu–Life was cited by Krugman for its failure to adhere to contract specifications (Def. Ex. CC—Letter from Krugman to Nu-life).

On March 27, 1984 Krugman addressed another letter to Nu–Life referring to several problems with the work at P.S. 100 (Def. Ex. DD). This letter was followed by several other warnings issued by the DSB stating objections to the workmanship and techniques employed by Nu–Life at each of the contract sites (see, e.g., Def. Ex. FF [Krugman letter of April 10, 1984 as to subquality painting and plaster work (P.S. 100)]; Def. Ex. JJ [Krugman letter of August 3, 1984 as to use of pneumatic tools in violation of contract (P.S. 132)]; Def. Ex. LL [Sheldon G. Tobak letter of September 7, 1984 to Krugman as to failure to complete work prior to opening of school (J.H. 126)].

By letter dated September 11, 1984 addressed to Donald Dyer, Acting Deputy Director for Maintenance of DSB, Krugman described some of the difficulties DSB was experiencing with Nu–Life in regard to the work performed at P.S. 100. Based on those difficulties, Krugman recommended that default proceedings be instituted against Nu–Life (Def's Ex. NN). A default proceeding is an administrative process by which a contractor is determined to be in breach of its obligations under its contracts. On or about September 17, 1984, Dyer requested that the Office of Contract Compliance hold Nu–Life in default with regard to the contract for P.S. 100.

On October 1, 1984, Krugman again recommended to Dyer that Nu–Life be placed in default, this time in connection with the work performed at P.S. 132 and J.H. 126. Krugman noted that, in his opinion, the personnel utilized by the contractor were unqualified (Def's Ex. QQ).

By letter dated October 2, 1984, Paul Damigos requested an additional 90 days to complete the work at P.S. 132, in accordance with the contract specifications (Def's Ex. PP). He attributed the delay, in part, to a lack of cooperation of the part of Dobrowolski and the custodians in the schools.

In a letter dated October 9, 1984, Paul Damigos complained to Krugman that Inspectors Trapanotto and Dobrowolski disapproved payment for work performed at P.S. 100. Damigos asserted that the inspectors were "bias [sic] against us because of personal reasons". Damigos concluded by demanding a meeting and he informed Krugman that Nu–Life would "take all steps necessary to protect [its] interests, and [would] hold [Krugman] personally responsible for damages" (Def's Ex. RR).

On October 22, 1984 Anthony Damigos met with Executive Director Borg, and informed him of the attempts to extort money from Nu–Life. The following day, in a memorandum dated October 23, 1984, Borg brought this complaint to the attention of Michael Sofarelli, the Board's Inspector General. Borg suggested that the matter be investigated. However, he also stated that there was a possibility that Nu–Life

was performing substandard work and that the problems it was experiencing with the inspectors actually stemmed from poor workmanship (Def's Ex. SS).

Borg also contacted Joyce Brauer, a Board lawyer and Special Assistant to the Executive Director of the Office of Contract Compliance, on or about October 23, 1984, to verify whether a Board of Review had been recommended. A "Board of Review" involves the investigation of a contractor's performance under a contract to determine whether a finding of default is justified. Brauer confirmed that such a review had been recommended (Tr. p. 4505). Borg expressed his concern that the charges raised by Nu–Life were merely a "smoke screen," intended to obfuscate the underlying problem of faulty workmanship.

In order to determine whether Nu–Life was performing substandard work, Borg asked Carl Grunow, a special inspector from the Contract Compliance Unit, to investigate Nu–Life's work at P.S. 132. Grunow, who was not part of the DSB regular workforce in the field, determined that Nu–Life's work was grossly substandard (Tr. p. 4422).

In addition, in October 1984, the Bureau of Maintenance recommended that Nu–Life be placed in default with regard to its contracts for work at P.S. 132 and J.H. 126 (Brauer Aff. ¶ 12). These requests were held in abeyance pending clearing by Inspector General Sofarelli. In early November 1984 the Office of Contract Compliance received clearance from the Inspector General's office to proceed with the default. In response to this action, on November 27, 1984, Nu–Life filed the first of seven lawsuits against the Board and various employees. On December 3, 1984 the first Board of Review was commenced, to investigate complaints lodged against Nu–Life concerning the poor quality of its workmanship (Def. Ex. Z [Letter from Joyce Brauer to I. William Spivak]).

During December 1984 a criminal investigation was undertaken by the Office of the District Attorney of Kings County, with the assistance of Anthony Damigos, with regard to allegations of extortion by building inspectors in Brooklyn. Anthony Damigos concealed a "wire" and tape recorded conversations with various building inspectors (Tr. p. 5457). The Board of Review was delayed several times as a result of the District Attorney's investigation. According to Joyce Brauer, she, along with Inspector General Sofarelli, objected to any delays of the Board of Review, maintaining that it could be conducted independently from the District Attorney's investigation. She stated that, even assuming that corruption was present, if the work of the contractor was unacceptable and not in accordance with contract specifications, a default would nevertheless be warranted (Brauer Aff. ¶ 18). Ultimately, the criminal investigation resulted in the convictions of several DSB inspectors (see e.g., People v. Manfredi, 166 A.D.2d 460, 560 N.Y.S.2d 679, 681 [2d Dep't 1990]).

In late 1985, a separate investigation into the quality of Nu–Life's work was conducted by the New York City Housing Authority on behalf of the Board. Inspectors, independent of the Board, reviewed the work performed under all of Nu–Life's contracts. In a comprehensive report dated April 30, 1986, Nu–Life's work was characterized as a "sub-standard" (Brauer Aff. ¶ 20; see also Def's Ex. CCC).

The Board of Review continued intermittently until July 20, 1987. The eventual finding of sub-standard work by Nu–Life resulted in a default with regard to the P.S. 100 contract. Given the substantial time and money expended in regard to the P.S. 100 default, the Board declined to continue default proceedings with regard to Nu–Life's other contracts (Woods Aff. ¶ 93).

In an Article 78 proceeding Nu–Life attacked this default, and it was ultimately vacated (See In re Nu–Life Construction Corp., 161 A.D.2d 765, 556 N.Y.S.2d 360 [2d Dep't 1990]). However, in March 1988, the Board of Responsibility of the New York City Housing Authority issued a decision independent of the Board of Review, finding that Nu–Life was not qualified to do work for the Housing Authority by reason of its defaults at various contract sites. In a second Article 78 proceeding, by a

decision of Justice Altman dated December 5, 1988, the Housing Authority's decision was confirmed (Def's Ex. X).

Nu–Life's present civil rights claims chronologically follow its action pursuant to the Racketeer Influenced Corrupt Organization ("RICO") statute, 18 U.S.C. § 1964(c), which was commenced by Nu–Life on March 18, 1986 ("RICO Action"). Along with another plaintiff, Terminate Control Corporation, Nu–Life sought civil RICO damages against the Board, the DSB, David Krugman, Stuart Horowitz, Stanley Dobrowolski, John Trapanotto, John Finocchiaro, Benjamin Haziak, John J. Manfredi, John Frisone, and Nicholas Borg.

After extensive motion practice and several amendments to the complaint, Nu–Life's RICO case was brought to trial against Borg, Horowitz, Dobrowolski, and Trapanotto on January 6, 1992. During trial, the Court dismissed Nu–Life's RICO conspiracy claim against Horowitz. By a verdict rendered on March 10, 1992, the jury determined that Nu–Life has failed to prove any RICO claim against Borg. In addition, the jury found that while Nu–Life did not prove that Trapanotto and Dobrowolski violated any substantive RICO counts, they did find that Trapanotto and Dobrowolski conspired to violate the RICO statute, which is a violation of the statute in itself (*See* 18 U.S.C. § 1962[d]).

During the course of the trial, the Court permitted Nu–Life to amend its complaint to add the civil rights claims pursuant to 42 U.S.C. § 1983 ("section 1983"). In response, the Board brought the instant motion for to dismiss the amended complaint and for summary judgment with regard to alleging Section 1983 violations.

The complaint sets forth three grounds for Section 1983 liability. First, it alleges violations of the plaintiff's First Amendment right to engage in constitutionally protected public speech by alleged acts of retaliation against Nu–Life in the form of the Board of Review proceeding, which was allegedly instituted with the intention of silencing any complaints Nu–Life would have made against the Board or its employees. Second, Nu–Life alleges that its rights under the Equal Protection Clause of the Fourteenth Amendment were violated in that the Board singled out Nu–Life, with malicious intent, for "enforcement of oppressive measures, under color of state law" (Complaint, at ¶ 33). Finally, Nu–Life alleges that its Fourteenth Amendment substantive and procedural Due Process rights were violated in that it was deprived of constitutionally protected property interests as to: 1) a pre-default hearing; 2) receiving money due for completed work; and 3) withholding future jobs on which Nu–Life was the lowest bidder (Complaint, at ¶ 31).

## DISCUSSION

### Motion to Dismiss Standard

On a motion to dismiss for failure to state a claim, "the court should not dismiss the complaint pursuant to Rule 12(b)(6) unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief' " (*Goldman v. Belden,* 754 F.2d 1059, 1065 [2d Cir.1985] [quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)]; *see also Branum v. Clark,* 927 F.2d 698 [2d Cir.1991]). In addition, such a motion is addressed solely to the face of a pleading, and "[t]he court's function ... is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally·sufficient" (*Goldman, supra,* 754 F.2d at p. 1067).

In assessing the sufficiency of a pleading on a motion to dismiss, it is well settled that the court must accept the allegations of the complaint as true (*see LaBounty v. Adler,* 933 F.2d 121, 123 [2d Cir.1991]; *Procter & Gamble Co. v. Big Apple Indus. Bldgs, Inc.,* 879 F.2d 10, 14 [2d Cir.1989], *cert. denied,* 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 [1990]), and must construe all reasonable inferences in favor of the plaintiff (*See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 [1974]; *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1099 [2d Cir.1988], *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 [1989]).

The Court should also be mindful that under the modern rules of pleading, a plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R.Civ.P. 8[a][2]), and that "[a]ll pleadings shall be so construed as to do substantial justice" (Fed.R.Civ.P. 8[f]).

Since all parties submitted extensive evidence outside of the pleadings and the defendant makes its motion to dismiss the complaint and for summary judgment, the Court will treat the motion as one for summary judgment and consider evidence outside the pleadings.

*Summary Judgment Standard*

A court may grant summary judgment "only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact," *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 [2d Cir. 1990], and the movant is entitled to judgment as a matter of law (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 [1986]; *see also* Fed.R.Civ.P. 56[c]; *Levin v. Analysis & Technology, Inc.*, 960 F.2d 314 [2d Cir. 1992] [summary judgment standard]). The Court must, however, resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion (*see Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 [2d Cir.1990]; *Liscio v. Warren*, 901 F.2d 274, 276 [2d Cir.1990]; *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 [2d Cir. 1986], *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 [1987]).

Once a party moves for summary judgment, in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists (*Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 [2d Cir.1990] [quoting Fed.R.Civ.P. 56[e]; *see National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 [2d Cir.1989]). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party" (*Liberty Lobby, Inc., supra*, 477 U.S. at p. 248, 106 S.Ct. at p. 2510; *see Converse v. General Motors Corp.*, 893 F.2d 513, 514 [2d Cir.1990]).

However, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment (*see Western World, supra*, 922 F.2d at p. 121). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable (*see Rattner v. Netburn*, 930 F.2d 204, 209 [2d Cir.1991]). Finally, the Court is charged with the function of "issue finding", not "issue resolution" (*Eye Assocs., P.C. v. IncomRx Sys. Ltd. Partnership*, 912 F.2d 23, 27 [2d Cir.1990]). It is with this framework that we turn to the grounds for the present motion for summary judgment. Since the Board of Education and the DSB are governed by the City of New York, Nu–Life must establish the municipal liability of the city.

*Section 1983 Municipal Liability under Monell*

█ It has long been recognized that for purposes of Section 1983, municipalities are persons subject to suit (*See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 [1978]). However, a municipality may not be held liable unless the alleged constitutional tort was caused by "the execution of a government's policy or custom" (*Monell, supra*, 436 U.S. at p. 694, 98 S.Ct. at p. 2037; *see Walker v. City of New York*, 974 F.2d 293, 295–96 [2d Cir. 1992]). Thus, a threshold issue confronting the Court is whether the conduct complained of by Nu–Life was executed pursuant to a "policy or custom" of the Board.

The Board contends that Nu–Life failed to establish a set of facts sufficient to fix *Monell* liability in the Board. It maintains that to hold the Board liable for the actions of the relatively small number of low-level DSB employees involved in the kickback scheme would merely constitute respondeat superior liability. Furthermore, the Board notes, that since no "final policy maker" was involved in the scheme, the Board is not liable (*See City of St. Louis v. Praprotnik*, 485 U.S. 112, 122, 108 S.Ct. 915,

924, 99 L.Ed.2d 107 [1988]; *Pembaur v. Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 [1986]).

The Supreme Court has recently reiterated the principles controlling municipal liability under Section 1983. In *Collins v. City of Harker Heights,* —— U.S. ——, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), Justice Stevens stated that the proper analysis of a Section 1983 claim requires a court to determine "(1) whether the plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation" (*Collins, supra,* —— U.S. at p. ——, 112 S.Ct. at p. 1066).

■ Since the principle of respondeat superior is not available for municipal liability under Section 1983, not all harm-causing conduct of municipal employees is actionable (*see Collins, supra,* —— U.S. at pp. —— – ——, 112 S.Ct. at pp. 1066–67). However, municipal liability for the conduct of municipal employees may be established if the alleged constitutional violation was committed pursuant to a governmental "policy or custom." Conduct constituting a municipal policy or custom has been the subject of much litigation. However, Section 1983 liability may be premised upon an officially promulgated policy or a persistent widespread practice, even though not officially recognized, but so well-settled as to constitute a custom (*See Sorlucco v. New York City Police Department,* 971 F.2d 864, 870–71 [2d Cir.1992]; *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 123 [2d Cir.1991]). In addition, the failure to train or "deliberate indifferent" as to training, usually seen in the context of excessive force cases, has been sufficient to constitute a custom or policy (*See City of Canton v. Harris,* 489 U.S. 378, 388–92, 109 S.Ct. 1197, 1204–1206, 103 L.Ed.2d 412 [1989]; *see also Walker, supra,* 974 F.2d at pp. 297–98 [failure to train a police officer]). In some cases, even a single decision made by one with final decision-making authority has been held sufficient to result in municipal liability (*See Praprotnik, supra,* 485 U.S. at p. 122, 108 S.Ct. at p. 924; *Pembaur, supra,* 475 U.S. at p. 480–81, 106 S.Ct. at p. 1298–99).

In the instant case, Nu–Life alleges that the kickback scheme was so widespread that it amounted to a *de facto* policy of the Board (*See e.g., Fiacco v. City of Rennselear,* 783 F.2d 319, 326–28 [2d Cir.1986] [evidence that municipality had notice but failed to take meaningful action with regard to excessive force charges against police, supported Section 1983 claim], *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 [1987]). Nu–Life specifically alleges that the kickback scheme pervaded the DSB and "involved acquiescence, knowledge, assistance and control" at the supervisory level of the Board's division (*see* Plt's complaint ¶ 30). The thrust of Nu–Life's Fourth Amended Complaint involves the conduct of the Building Inspectors, Trapanotto and Dobrowolski, their supervisor Krugman and DSB Executive Director Borg. To understand the relationship between the inspectors, the Board, and the DSB, the Court must examine the chain of command within the Board of Education.

The Board of Education is a seven-member policy making body comprised of one member appointed by each Borough President and two appointed by the Mayor (*See* N.Y. Educ. Law § 2590–b[1][a] [McKinney 1992]). Directly responsible to the Board itself is the office of the Chancellor of the Board. The Deputy Chancellor for Financial Affairs is one of several offices and individuals directly responsible for to the Chancellor. Next in the chain of command is the Chief School Business Executive, who oversees the DSB.

Borg was the head of the DSB, during the relevant times in this case. The chain of command within the DSB between Borg and Area Manager Krugman contained five layers of managerial offices. The person who reported to Krugman was General Building Inspector Dobrowolski and Field Inspector Trapanotto reported to Dobrowolski. The above chain of command illustrates that between Borg and Trapanotto there were nine levels of supervisory employees (Tr. pp. 4470–72).

In the chain of command below the Board itself are no fewer than eighty subdivisions and subordinate offices. Further-

more, at approximately the time of the alleged violations, the DSB employed more than seven thousand employees. At the RICO trial there was testimony from Krugman and a former inspector, Jerry Golding, indicating that of all the inspectors at the DSB, only approximately eight to ten were involved in taking money from contractors (Tr. pp. 2305, 2366–67 [Krugman]; pp. 351–54; 359–60; 399–400 [Golding]).

The power of the Board is governed by New York Education Law § 2590–g, which states that

> "[t]he city board except as otherwise provided herein shall have all the powers and duties the interim board of education of the city district had on the effective date of this article *and shall determine all policies of the city district*"

(*Id.* [emphasis added]).

Therefore, by statute, the seven member Board is the sole and final policymaking body of the entire Board of Education. Since the Supreme Court stated that "only those municipal officers who have 'final policymaking authority' may by their actions subject the government to § 1983 liability" (*Praprotnik, supra,* 485 U.S. at p. 123, 108 S.Ct. at p. 924 [*quoting Pembaur, supra,* 475 U.S. at p. 483, 106 S.Ct. at p. 1300) only the Board itself has the final policy making authority. The Board, therefore, is responsible for the acts which it "officially sanctioned or ordered" (*Pembaur, supra,* 475 U.S. at p. 480, 106 S.Ct. at p. 1298).

Board liability is triggered when it engaged in some course of affirmative conduct resulting in the violation of Nu–Life's constitutional rights. There is no evidence to indicate: (1) that the Board itself was involved in the kickback scheme; (2) that it contributed to the length of the Board of Review process; (3) that any Board member played any role in the conduct at issue, (4) that any Board member knew of the illegal activity with regard to Nu–Life, or (5) that any Board member had any knowledge or involvement in the extortion scheme. Therefore, the Board is not liable under the theory of affirmative conduct

(*See Pembaur, supra,* 475 U.S. at p. 480, 106 S.Ct. at p. 1298).

■ Liability may alternatively be established if Nu–Life proves that the relevant employees of the DSB were "officials 'whose acts or edicts may be fairly said to represent official policy' " (*Pembaur, supra,* 475 U.S. at p. 480, 106 S.Ct. at p. 1299 [*quoting Monell, supra,* 436 U.S. at p. 694, 98 S.Ct. at p. 2037]). In discussing this aspect of liability, the *Pembaur* court held "that municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question" (*Pembaur, supra,* 475 U.S. at pp. 483–84, 106 S.Ct. at p. 1300). Therefore, to establish *Monell* liability of the Board by way of DSB employees, such as Borg or Krugman, Nu–Life must show that their actions could fairly be said to represent Board policy. In this regard, it must also be established that DSB employees were responsible for policymaking authority as to the inspection and the Board of Review process, which are the principal activities Nu–Life alleges led to the violation of its constitutional rights.

There is no evidence that Trapanotto, Dobrowolski, or Krugman were in a position to pursue their actions as representing official Board or DSB policy. Trapanotto and Dobrowolski were field inspectors on the lowest chain of command level, whose actions and responsibilities could not represent such Board or DSB policy as a matter of law. Although they were charged with part of the inspection process, they did not make policy decisions. As far as the default process, the inspectors played no part in the Board of Review process itself and only reported on work performed. Thus, under *Monell,* it cannot be said that the actions of the inspectors constitute a legally sufficient basis to establish the liability of the Board (*See Pembaur, supra,* 475 U.S. at pp. 480–82, 106 S.Ct. at pp. 1298–99).

This reasoning is also applicable to Area Manager Krugman. Like Trapanotto and Dobrowolski, Krugman was not a policy maker with regard to the inspection process. Although Krugman initiated the Board of Review process by recommending that Nu–Life be held in default, his actions have nothing to do with making Board of Review policy. Therefore, Krugman's actions cannot establish the liability of the Board, as a matter of law (*See Pembaur, supra*, 475 U.S. at pp. 480–82, 106 S.Ct. at pp. 1298–99).

■ The DSB Executive Director, Borg, could not be considered the final policy maker for the DSB in regard to the Section 1983 allegations of Nu–Life because of the New York statute which grants the power and authority exclusively to the Board (N.Y.Educ.Law § 2590–g). However, assuming that Borg was in a relevant policy making position, Nu–Life must establish that his actions must have contributed to a violation of Nu–Life's civil rights. The record and the prior jury verdict refute any such contention. Indeed, when allegations of extortion and bribery were first brought to Borg's attention, he immediately informed the Inspector General (Def. Ex. SS). Borg also contacted Joyce Brauer, a lawyer with the Office of Contract Compliance, to learn if there were any other similar complaints in her office. Furthermore, he cooperated in the investigation of the District Attorney of Kings County who indicted those DSB employees who were involved in the scheme.

In addition, after a nine week trial which fully exhausted the relevant evidence available, the jury in the RICO Action rendered a verdict on March 13, 1992 which found that Nu–Life failed to "prove, by a preponderance of the evidence, all of the three (3) elements required to establish that the defendant NICHOLAS E. BORG violated the conspiracy section of the RICO statute" (Verdict Sheet in RICO Action, dated March 13, 1992, at ¶ 6).

Nu–Life further contends that the kickback scheme was so pervasive in the industry as to be tantamount to a governmental "custom" which deprived Nu–Life of its constitutional rights, or that a policy of "deliberate indifference" existed at the highest level of the Board which encouraged the practice of extortion at lower levels.

As an alternative theory to establish a "custom" under *Monell*, Nu–Life claims that when widespread unconstitutional conduct is known to policy makers, but they fail to act to prevent it, causing the plaintiff's injury, there is municipal liability (Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation*, § 6.12 [1991] [hereinafter Nahmod]). Essentially, Nu–Life contends that the Board acquiesced in the kickback scheme and it supports this contention by pointing to evidence of the scheme, such as the criminal convictions of certain inspectors. Nu–Life assumes two crucial elements in this premise. First, that "acquiescence" is a legally cognizable theory under which to establish a "custom" for Section 1983 purposes. Second, that the kickback activity, in addition to being illegal, was unconstitutional as well.

In a case similar to this, *Sanchez v. City of Chicago*, 1986 WL 5010 (N.D.Ill. April 23, 1986), the Court held that allegations of the City's condonation of bribe taking by low level officials in the fare assignment system for taxicab operators at O'Hare International Airport did not state a Section 1983 claim. The Court accepted the fact that bribe taking existed at the airport, but found that the plaintiff in the *Sanchez* case failed to state a claim because "[t]he gravamen of the complaint remains not the City's endorsement of bribery in the fare assignment system at O'Hare, but simply the City's failure to take severe enough steps to stop the bribery altogether" (*Sanchez, supra*, at *1). Crucial to this finding was that the plaintiff set forth no evidence that the City's failure to eradicate the bribery was due to "actual indifference" and not other problems such as limited prosecutorial resources.

In a similar vein, in a report and recommendation made by Magistrate Judge Lee of the Southern District of New York, in connection with a labor dispute, it was stated that "[m]ere acquiescence in the conduct

of the individual city employees is insufficient to amount to 'official policy'; plaintiff has the heavy burden of demonstrating the existence of an unconstitutional municipal policy authorized by persons with final policymaking authority under State law" (*Brasch v. Koch*, 1988 WL 156812 [June 29, 1988], *adopted by*, 713 F.Supp. 709 [S.D.N.Y.1989] ).

■ The foregoing cases indicate that corruption by low level employees will not sustain a Section 1983 cause of action against a municipality. Assuming that "acquiescence" alone does sufficiently state a claim, in the present case there is no evidence that the Board acquiesced in any way or failed to act to rid the DSB of the kickback scheme. On the contrary, the record indicates that a prompt investigation was conducted with the cooperation of Inspector General Sofarelli, Joyce Brauer and Borg immediately after a complaint was received. These actions were apparently the full measure of possible amelioration by the upper level DSB employees. Thus, Nu–Life failed to raise a genuine issue of material fact in regard to any acquiescence by the Board or the DSB.

Nu–Life also contends that Board and other various high level officials acted with "deliberate indifference" with regard to the alleged extortion by the inspectors, so as to constitute a "policy" designed to encourage these practices. Under this theory, Nu–Life essentially raises the same contentions as it did regarding the existence of a "custom" of corruption among DSB employees.

The "deliberate indifference" standard asserted by Nu–Life has been usually applied by the Supreme Court with regard to the issue of whether a municipality has "failed to train" an employee so as to give rise to a constitutional violation. Further, it appears that the deliberate indifference standard has been most often utilized with respect to allegations of failure to train police as to the furnishing of medical care (*see Harris, supra*, 489 U.S. at p. 387, 109 S.Ct. at p. 1204) or the application of excessive force (*See, e.g., Fiacco, supra*, 783 F.2d at pp. 331–32). The term "deliberate indifference" has also been used to define a violation of the Eighth Amendment (*See Estelle v. Gamble*, 429 U.S. 97, 104–06, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 [1976] ).

In this case, the question is whether the Board was deliberately indifferent to the rights of independent contractors by failing to rectify or prevent the kickback scheme and its related effects. This standard requires more than a showing of "gross negligence" (*See* Nahmod, *supra*, at p. 467). The application of the standard of deliberate indifference to the facts in this present case appear to break new ground. Neither party cited any precedent utilizing this theory in the context of facts similar to this case, namely a low level extortion scheme. However, even assuming that the application of the "deliberate indifference" standard would be appropriate to this factual scenario, it is totally unsupported by any evidence.

A policy has been defined as a "deliberate" or "conscious" choice to follow a course of action made from several alternatives (*See Pembaur, supra*, 475 U.S. at pp. 483–84, 106 S.Ct. at p. 1300; *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 [1985] ). In order to establish liability on the part of the Board, Nu–Life would have to show that the alleged extortion committed by the low level DSB employees was plainly obvious to the Board and DSB, so that the need for its intervention was equally obvious, and that the Board was "deliberately indifferent" to that need. In addition, the failure to intervene must have been a "cause" of Nu–Life's business injury.

Even if the Court assumes that the Board "knew" about the conduct of the inspectors, as stated above, there is no evidence of a failure on the part of the DSB to fully, fairly, and promptly respond to such information. When this situation was brought to the attention of the DSB and the Board, prompt, proper, and meaningful investigations were undertaken, the Board of Review was temporarily halted, and criminal prosecutions were supported.

In reviewing Nu–Life's allegations and the evidence submitted, this Court concludes that Nu–Life failed to meet its bur-

den in response to the Board's motion for summary judgment. That burden could only be satisfied by offering evidence from which to reasonably infer that a genuine issue of material fact exists on the issue of a custom or policy of corruption, acquiescence or deliberate indifference. The Court finds that Nu–Life failed to demonstrate a "policy of inaction", as a matter of law (*see Gentile v. County of Suffolk*, 926 F.2d 142, 155–53 [2d Cir.1991]), and accordingly, the Board's motion for summary judgment dismissing Nu–Life's civil rights claims against the Board, and its subsidiary, the DSB, must be granted.

*The Individual Defendants*

There are also claims made against the individual defendants named in the complaint. These claims must rise to a level that implicates the deprivation of a constitutional right. To determine whether the claims of deprivation of First Amendment, Due Process, and Equal Protection rights rise to a constitutional level, the Court will examine each claim seriatim.

*First Amendment*

■ Nu–Life alleges violations of its First Amendment right to engage in constitutionally protected public speech by contending that the Board of Review proceeding was instituted in retaliation for the complaints Nu–Life lodged against the Board and DSB. While this claim is vaguely pleaded in the complaint, it is argued by Nu–Life on this motion that it is based upon the deprivation of Nu–Life's employment interest.

A line of cases deal with public speech in the realm of government employment holding that in determining whether there was a violation of First Amendment rights, it is the role of the courts to "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" (*Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 [1968]; *see also Ezekwo v. New York City Health & Hospitals Corp.*, 940 F.2d 775, 780 [2d Cir.] [*quoting*

*Pickering, supra*, 391 U.S. at p. 568, 88 S.Ct. at p. 1734], *cert. denied*, —— U.S. ——, 112 S.Ct. 657, 116 L.Ed.2d 749 [1991]).

In discussing the *Pickering* balancing approach, the Supreme Court stated that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement" (*Connick v. Myers*, 461 U.S. 138, 148, 103 S.Ct. 1684, 1691, 75 L.Ed.2d 708 [1983]).

In dealing with situations involving claims that an employee was discharged or disciplined because of the exercise of First Amendment rights, the Second Circuit stated that the employee "must establish two elements to prevail on the claim: (1) that the conduct at issue was protected speech; and (2) that the speech played a substantial part in the employer's adverse employment action; *i.e.*, that the adverse action would not have occurred *but for* the employee's protected actions" (*Ezekwo, supra*, 940 F.2d at pp. 780–81).

In the present situation, however, Nu–Life does not have the kind of employment relationship with the government as is presented in the cases dealing with the deprivation of First Amendment rights (*See id.*). Nu–Life alleges that the Board of Review proceeding was a result of its complaints of extortion. As a matter of law, the Court finds that the institution of a Board of Review proceeding involving a government contractor, which is a form of due process, does not constitute a violation of the contractor's First Amendment rights (*Cf. Downtown Auto Parks, Inc. v. City of Milwaukee*, 938 F.2d 705, 709–10 [7th Cir.] [court differentiated between discharging a government employee for partisan reasons and failing to award a public contract for partisan reasons], *cert. denied*, —— U.S. ——, 112 S.Ct. 640, 116 L.Ed.2d 657 [1991]; *Horn v. Kean*, 796 F.2d 668, 673–74 [3d Cir.1986] [declined to extend First Amendment protection to contractors who serve as New Jersey motor vehicle agents]).

*Due Process*

■ Second, Nu–Life alleges that its Fourteenth Amendment Due Process

rights were violated in that it was deprived of constitutionally protected property interests. "In seeking a default without affording the contractor a pre-default hearing, in refusing to make payments due to plaintiff, in withholding jobs on which plaintiff was the lowest bidder," Nu–Life contends it was deprived of its due process rights (Fourth Amended Complaint, at ¶ 31). These allegations appear to both address the deprivation of procedural due process by not having a hearing, and the substantive due process by alleging the taking of the property interest (*See Board of Regents v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 [1972]).

In order to assert a claim under either substantive due process or procedural due process, Nu–Life must assert that there was a property interest. According to the Second Circuits interpretation of *Roth* "[t]o state a claim under ... the Due Process Clause ... plaintiffs were required to allege facts showing that state action deprived them of a protected property interest" (*Story v. Green*, 978 F.2d 60, 62 [2d Cir.1992] [*citing Roth, supra*, 408 U.S. at pp. 576–79, 92 S.Ct. at pp. 2708–10].

Governmental action alleged to have violated the Due Process clause may only be successfully challenged "when it may be shown that it deprives a litigant of a property or liberty interest" (*See General Elec. v. New York State Dept. of Labor*, 936 F.2d 1448, 1453 [2d Cir.1991]). To claim a property interest in a benefit, a plaintiff must "show more than an abstract need or desire for it" or "a unilateral expectation of it" (*Roth, supra*, 408 U.S. at p. 577, 92 S.Ct. at p. 2709; *see also Story, supra*, 978 F.2d at p. 62] [need more than unilateral expectation]). The existence of such property interests depend on "state law-rules or understandings that secure certain benefits and support claims of entitlement" (*Roth, supra*, 408 U.S. at p. 577, 92 S.Ct. at p. 2709) such as a state contract or statute (*see S & D Maintenance Co., Inc. v. Goldin*, 844 F.2d 962, 965 [2d Cir.1988]).

In order to constitute a protected property interest under *Roth*, there must a certain "concreteness of entitlement" to the contract right (*Walentas v. Lipper*, 862 F.2d 414, 419 [2d Cir.1988], *cert. denied*, 490 U.S. 1021, 109 S.Ct. 1747, 104 L.Ed.2d 183 [1989]; *see e.g., Perry v. Sinderman*, 408 U.S. 593 (1972) [tenured status in public employment]; *Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 [1976] [social security benefits]; *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 [1974] [claim to permanent civil service employment]).

The Board maintains that the termination provision contained in the bid contracts at issue, which permit termination upon written notice to the contractor, deprives Nu–Life of any constitutionally cognizable property rights in existing contracts (*See, e.g.*, P.S. 100 Contract, Article 74, Plt's Trial Ex. 14). The Court finds that based on these termination provisions there is no "concreteness of entitlement" to future contracts, according to the terms of the contracts, therefore termination of contracts by the Board does not deprive Nu–Life of constitutionally protected property interests (*See Cleveland Bd. Of Education v. Loudermill*, 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 [1985]; *see e.g. S & D Maintenance, supra*, 844 F.2d at p. 965).

In addition, according to the Second Circuit, "if the deprivation is caused by random, unauthorized state conduct and an adequate post-deprivation hearing is available, there is no denial of 'due process', and therefore, no constitutional violation on which to base a § 1983 claim" (*Kraebel v. New York City Dep't of Housing Preservation & Development*, 959 F.2d 395, 404 [2d Cir.], *cert. denied*, —— U.S. ——, 113 S.Ct. 326, 121 L.Ed.2d 245 [1992]; *see also Zinermon v. Burch*, 494 U.S. 113, 126, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 [1990]). A plaintiff may assert a Section 1983 claim when the conduct constitutes "established state procedure" (*Id.*).

█ After reviewing this legal standard, this Court determines, as a matter of law, that the extortion conduct by Trapanotto and Dobrowolski does not constitute "established state procedure" and therefore Nu–Life is not entitled to bring a Section

1983 claim for the alleged deprivation since adequate state remedies are available in an Article 78 proceeding.

Nu–Life claims that it has a right to timely payment for *work already performed* for a state agency. The Second Circuit has stated that such right is a property interest protected by the Due Process clause (*See General Electric, supra*, 936 F.2d at p. 1453). However, again, Nu–Life may not maintain an action for deprivation of property without due process when there is an adequate "post-deprivation" remedy in the Article 78 proceeding.

■ Further, Nu–Life alleges that in withholding future jobs on which plaintiff was the lowest bidder, Nu–Life was deprived of its due process rights. Since the Second Circuit has held that there is no property interest in the non-termination of an existing government contract (*see S & D Maint. Co. v. Goldin*, 844 F.2d 962, 966–68 [2d Cir.1988]; *see also John's Insulation v. Siska Const. Co.*, 774 F.Supp. 156, 161 n. 6 [S.D.N.Y.1991]), the Court finds, as a matter of law, that there is no property right owing to Nu–Life for such future bid contracts. The right to such contracts is remote, speculative, and also terminable at the will of the Board. Therefore as to the kind of government contract at issue in the present case, there is no property interest implicated, as a matter of law.

*Equal Protection*

■ Finally, Nu–Life alleges that its rights under the Equal Protection Clause of the Fourteenth Amendment were violated in that the Board singled out Nu–Life with malicious intent for "enforcement of oppressive measures, under color of state law" (Complaint, at ¶ 33).

When courts address a claim of deprivation of Equal Protection rights the situations generally fall into two distinct groups. The first group consists of situations where a statute is being challenged on constitutionality grounds. The general rule for this first group of cases is that "[w]hen a statute neither impinges on a fundamental right guaranteed by the Constitution nor uses a classification based on

a suspect criterion such as race, nationality, alienage, or gender, the law generally will not be found to violate the Equal Protection Clause unless it has no reasonable or rational basis" (*Story, supra*, 978 F.2d at pp. 63–64). The present situation does not fall within the group of cases challenging the constitutionality of a statute.

The second group of cases deals with a facially lawful statute which is being applied by the state in a manner which would deprive a person of Equal Protection. When addressing a claim of selective application of a facially lawful state regulation, the Second Circuit has stated that there must be a finding that

"(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person" (*FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 [2d Cir. 1992]).

The factual situation in this case does not come within the purview of the second group of cases.

Since the factual scenario of this case is not within the realm of matters which are protected by the Equal Protection Clause of the Fourteenth Amendment, the Court finds, as a matter of law, that Nu–Life failed to sustain its burden of showing that it has a recognizable claim arising under the Equal Protection Clause.

Nu–Life premised its Section 1983 claims against the individual defendants upon the alleged deprivation of First Amendment, Due Process, and Equal Protection rights. The Court determines, as a matter of law, that none of these alleged claims rise to a constitutional level so that Nu–Life cannot pursue its civil rights claims against any of the individual defendants named in the Fourth Amended Complaint.

## CONCLUSION

Based on the foregoing, the motion for summary judgment by the defendant

Board, pursuant to Fed.R.Civ.P. 56, is granted in its entirety.

In addition, since the parties fully briefed the First Amendment, Due Process, and Equal Protection claims, the Court grants summary judgment, pursuant to Fed. R.Civ.P. 56, in favor of all individual defendants on these claims.

The Fourth Amended Complaint is therefore dismissed in its entirety.

SO ORDERED.