**TERMINATE CONTROL CORP., Plaintiff,**

**Nu–Life Construction Corporation, Plaintiff–Appellee–Cross–Appellant,**

v.

**Stuart HOROWITZ; John J. Manfredi; John Frisone; John Does 1 through 20, Defendants,**

**Division of School Buildings of The Board of Education of The City of New York; Nicholas E. Borg; Board of Education, Defendants–Cross–Appellees,**

**Stanley W. Dobrowolski and John Trapanotto, Defendants–Appellants–Cross–Appellees.**

**Nos. 92, 95 and 471, Dockets 93–7009, 93–7049 and 93–7050.**

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1993.

Decided July 5, 1994.

Stanley Dobrowolski, pro se.

John Trapanotto, pro se.

Gary S. Graifman, New York City (Kantrowitz & Goldhamer, P.C., Chestnut Ridge, NY), for plaintiff-appellee-cross-appellant.

Elizabeth I. Freedman, Asst. Corp. Counsel of the City of New York, New York City (O. Peter Sherwood, Corp. Counsel of the City of New York, Francis F. Caputo, John P. Woods, Susan Finkenberg, Asst. Corp. Counsels of the City of New York, New York City, of counsel), for defendants-cross-appellees.

Before: OAKES, PRATT and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Stanley W. Dobrowolski and John Trapanotto appeal *pro se* from an amended judgment entered December 14, 1992 in the United States District Court for the Eastern District of New York, Arthur D. Spatt, *Judge,* upon a jury verdict finding them civilly liable to Nu–Life Construction Corporation ("Nu–Life") for a violation of 18 U.S.C. § 1962(d), a provision of the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. §§ 1961–68 ("RICO"), by conspiring to extort Nu–Life. Dobrowolski argues that the district court erred in not appointing counsel to represent him at trial. Dobrowolski and Trapanotto both contend that: (1) attorney fees should not have been awarded against them based upon work relating to issues as to which Nu–Life did not prevail and/or which involved litigants other than Dobrowolski and Trapanotto; (2) damages based upon lost profits on nonawarded municipal contracts should not have been granted to Nu–Life; and (3) the jury instructions in this case erroneously permitted standing for Nu–Life on its claim of civil RICO conspiracy to be premised upon injuries caused by nonpredicate acts.

Nu–Life cross-appeals from the same judgment. Nu–Life argues that the district court improperly limited the pool of predicate acts that the jury could consider in determining whether certain of the individual defendants engaged in a pattern of racketeering activity against Nu–Life in violation of 18 U.S.C. § 1962(c) and (d). In addition, Nu–Life cross-appeals from the judgment insofar as it granted summary judgment dismissing Nu–Life's fourth amended complaint. That complaint sought to hold the Board of Education of the City of New York (the "Board") and (arguably) the individual defendants named therein liable under 42 U.S.C. § 1983 for retaliating against Nu–Life as a result of Nu–Life's refusal to comply with, and reports to public authorities concerning, a systematic practice of requiring contractors to participate in a kickback scheme conducted by the Board's Division of School Buildings (the "DSB") in the awarding of DSB maintenance and repair contracts. Nu–Life claimed violations of its constitutional rights of due process, equal protection, freedom of expression, and to petition the government for a redress of grievances.

We affirm the judgment against Dobrowolski and Trapanotto and the summary judgment dismissing Nu–Life's fourth amended complaint against the Board of Education, but affirm in part and vacate and remand in part with respect to the dismissal of the fourth amended complaint against the individual defendants named therein.

## Background

### A. *Nu–Life's RICO Claims.*

On March 18, 1986, Nu–Life and Terminate Control Corp.[1] commenced this action against the Board, the DSB, and several named and unnamed employees of the DSB. Nu–Life alleged a widespread scheme of solicitation of kickbacks in connection with the awarding of DSB building repair, maintenance, and construction contracts. Nu–Life further alleged that "a set percentage existed for such kickback[s] in the sum of two-percent (2%) of the contract price for all contract work approved for payment; ten percent (10%) of all cost overruns which were necessary or reasonably required to complete the work and twenty-five percent (25%) of all unnecessary extras which the inspector agreed to give to the contractor."

In multiple counts, Nu–Life averred violations of the Hobbs Act, 18 U.S.C. § 1951, by enterprises consisting of various combinations of the individual defendants, the Board, and the DSB, all of which enterprises engaged in and/or conspired to engage in a pattern of racketeering activity in violation of § 1962(c) and (d). According to Nu–Life, the conduct directed toward it was "part of customary practice and procedure which was knowingly and willfully engaged in and authorized by [the Board] and constituted a direct benefit to the [Board] and the [DSB]." Nu–Life sought treble damages and attorney fees pursuant to 18 U.S.C. § 1964(c).

During 1984 and 1985, the DSB awarded Nu–Life contracts for painting and repair

---

1. Terminate Control Corp., a plaintiff in this action, is not a party to this appeal.

work at three Brooklyn schools: public schools 100, 126, and 132. According to trial testimony by Anthony Damigos, a Nu–Life foreman (and the father of Paul Damigos, Nu–Life's President), when Nu–Life refused to pay kickbacks in connection with its contract performance, Trapanotto, a DSB field inspector, called Nu–Life's decision a "big mistake," and predicted that Nu–Life was "going to have a lot of problems ... because everybody is expecting [the kickback]."

Nu–Life provided considerable trial testimony concerning the ensuing problems. For example, Anthony Damigos related that as a consequence of Nu–Life's refusal to accede to the kickback demands, Trapanotto withheld the fifth and final payment due on its P.S. 100 contract. Anthony Damigos testified that he then sought a meeting to discuss this situation with Trapanotto and his superiors, David Krugman, a DSB manager, and Dobrowolski, a DSB general inspector who subsequently pled guilty to a charge of bribetaking in connection with his DSB activities. At that meeting, according to Anthony Damigos, Dobrowolski attempted to enforce Trapanotto's demands, warning: "I can sit on your payments for two weeks and then disapprove it [sic]." Spencer Campbell, a Nu–Life employee, testified that at the direction of Dobrowolski, Nu–Life's work on P.S. 132 was sabotaged by the cutting of safety ropes to a scaffolding from which Nu–Life employees worked.

Paul Damigos testified that he and his father met with Nicholas E. Borg, executive director of the DSB, to complain about the kickback demands and related retaliation, and that Borg assured them that these problems would be addressed and the retaliation would cease. Nu–Life claims that instead, the DSB promptly instituted default proceedings against Nu–Life. (Default proceedings are administrative proceedings at which a contractor appears before an in-house board of review to respond to charges that it is in default on DSB contracts.) Further, a Board employee testified that Borg subsequently directed him to "take no action on all bid tabulation sheets wherein Nu–Life was the low bidder."

In addition, several witnesses testified that Dobrowolski and Trapanotto were among the key participants in a systematized scheme of extortion "shake downs" carried out by many employees of the DSB. Jerome Golding, a former DSB inspector, testified that a group of DSB inspectors formalized the scheme during a meeting in 1976 or 1977. *See People v. Manfredi*, 166 A.D.2d 460, 463, 560 N.Y.S.2d 679, 682 (2d Dep't), (referring to "seminal" luncheon meeting that was formative of kickback conspiracy), *appeal denied*, 76 N.Y.2d 1022, 566 N.E.2d 1178, 565 N.Y.S.2d 773 (1990). Thereafter, participants met every four to six weeks to coordinate the effort and carry it forward. Golding also testified that the kickbacks were divided among DSB inspectors and area managers according to a prearranged scheme.

On December 2, 1991, on motion by the DSB and the Board, Judge Spatt dismissed the RICO counts against them on the ground that "a municipal entity ... is incapable of forming the criminal intent necessary to establish the underlying predicate offenses under the Hobbs Act, and therefore may not be held civilly liable under RICO, 18 U.S.C. § 1964(c)." *Nu–Life Constr. Corp. v. Board of Educ.*, 779 F.Supp. 248, 252 (E.D.N.Y. 1991). This ruling has not been challenged by Nu–Life on appeal.

The RICO claims ultimately went to the jury against Dobrowolski and Trapanotto, who were charged with both substantive (§ 1962(c)) and conspiracy (§ 1962(d)) RICO violations, and Borg, who was charged only with a RICO conspiracy violation. On March 13, 1992, the jury found that Nu–Life had failed to prove that Trapanotto and Dobrowolski had violated § 1962(c), but had proved that Dobrowolski and Trapanotto had conspired to engage in a pattern of racketeering activity in violation of § 1962(d). The jury found that Borg had not violated § 1962(d). The jury awarded a total of $23,400 in damages to Nu–Life against Dobrowolski and Trapanotto, apportioned as follows:

1) $4,500 for improperly withheld payments for work completed under the contract concerning P.S. 132;

2) $7,500 for lost profits due to work Nu–Life was improperly prevented from

completing under the contract concerning P.S. 132;

3) $5,000 for improperly withheld payments for work completed under the contract concerning P.S. 126; and

4) $6,400 for lost profits on any or all of thirty-six contracts as to which Nu–Life was the low bidder but was not awarded the contracts.

This award was trebled pursuant to § 1964(c). Nu–Life also applied for attorney fees pursuant to § 1964(c), and Judge Spatt subsequently awarded attorney fees and costs to Nu–Life against Trapanotto and Dobrowolski in the amount of $193,265.94. *See Nu–Life Constr. Corp. v. Board of Educ.*, 795 F.Supp. 602, 609 (E.D.N.Y.1992) (*"Nu–Life I"*).

### B. *Nu–Life's Civil Rights Claims.*

In March 1985, Nu–Life brought a civil rights action against the Board, Dobrowolski, Trapanotto, and Krugman in the United States District Court for the Eastern District of New York. The complaint, based upon allegations similar to those in the instant case, sought damages and an injunction against the default proceedings then underway at the DSB against Nu–Life. Judge Eugene H. Nickerson dismissed the action as premature because the board of review had not yet found Nu–Life in default on any DSB contracts.

Because the default proceedings had still not been completed at the time the instant action was commenced, Nu–Life omitted civil rights counts from its complaint and initial amended complaint in this case. After a finding of default by the board of review against Nu–Life, however, Nu–Life moved before Judge Spatt to further amend its complaint in the case at bar to add civil rights claims. This motion was denied on May 18, 1991. Nu–Life again moved, prior to the commencement of trial on January 6, 1992, to amend its complaint to assert "civil rights claims against the Board and [the DSB]." This motion was denied on January 16, 1992. On February 28, 1992, however, Judge Spatt conceded error in this ruling, and granted the motion to amend the complaint "to add [Nu–Life's] civil rights claims against the

[Board] and the [DSB]." By that time, the RICO trial was well underway, and it was too late to try the civil rights claims together with the RICO claims. Accordingly, the district court granted Nu–Life's motion to amend, but reserved substantive consideration of the new claims until after the RICO trial.

In June 1992, Nu–Life filed its fourth amended complaint asserting substantially the same facts that it had previously alleged, but stating civil rights claims against the Board (and arguably against the individual defendants named therein), and charging that the kickback demands targeted at Nu–Life "were part of customary widespread practice and procedure engaged in by all Division Inspectors and Regional Managers [of the DSB] which was knowingly and willfully engaged in and authorized by the [Board]." In addition, Nu–Life alleged that it had "met with and registered complaints regarding the corrupt scheme with the Board of Education Inspector General ..., the Kings County District Attorney ... and the media, all of which constituted an exercise of [Nu–Life's] right under the First Amendment to free speech and to petition the government." The complaint described the alleged retaliatory acts as violations of Nu–Life's "rights under the First and Fourteenth Amendments ..., including the Equal Protection Clause and Due Process Clause thereof," and sought $4.5 million in damages from the Board.

The Board moved for summary judgment dismissing the fourth amended complaint, and the district court granted that motion, *see Nu–Life Constr. Corp. v. Board of Educ.*, 809 F.Supp. 171 (E.D.N.Y.1992) (*"Nu–Life II"*), ruling that there was inadequate evidence of a Board policy or custom to demand kickbacks to avoid summary judgment. *Id.* at 177–82. The court then proceeded to address, and dismiss, civil rights claims against the individual defendants for violation of Nu–Life's First Amendment, due process, and equal protection rights, *id.* at 182–84, stating: "[S]ince the parties fully briefed the First Amendment, Due Process, and Equal Protection claims, the Court grants summary judg-

ment ... in favor of all individual defendants on these claims." *Id.* at 185.

This appeal and cross-appeal followed.

## Discussion

We consider first the appeal of Dobrowolski and Trapanotto, and then the cross-appeal of Nu–Life.

### I. THE APPEAL

On appeal, Trapanotto and Dobrowolski advance several arguments. First, Dobrowolski argues that the district court erred in not appointing counsel to represent him at trial. Second, Trapanotto and Dobrowolski maintain that the district court improperly awarded attorney fees to Nu–Life with respect to issues as to which Nu–Life did not prevail and/or which involved litigants other than Dobrowolski and Trapanotto. Third, they contend that the damages awarded to Nu–Life that resulted from potential lost profits from unawarded contracts on which Nu–Life was the low bidder are not a permissible basis of RICO recovery. Finally, Trapanotto and Dobrowolski argue that the jury instruction in this case erroneously permitted standing for Nu–Life on its claim of civil RICO conspiracy to be premised upon injuries caused by nonpredicate acts.

We reject all of these contentions for the reasons hereinafter stated. With respect to the jury instruction claim, we agree that the instructions on this issue were erroneous, but conclude that the error was harmless.

### A. Appointment of Counsel for Dobrowolski.

█ Prior to trial, Dobrowolski sought the appointment of counsel to represent him. After reviewing a statement by Dobrowolski concerning his net worth and employability, Judge Spatt concluded that Dobrowolski was financially able to retain counsel, and accordingly declined to appoint counsel for him. Dobrowolski appeared *pro se* throughout the trial below, as he does on this appeal.

In his argument to this court, Dobrowolski does not contest the district court's finding that he could afford to hire counsel, but does argue that the district court failed to consider the appropriate factors in deciding not to appoint counsel to represent him. Dobrowolski calls our attention to *Hodge v. Police Officers,* 802 F.2d 58 (2d Cir.1986). In *Hodge,* after noting that district courts have broad discretion under 28 U.S.C. § 1915(d) regarding the appointment of counsel for indigent litigants, *id.* at 60, we stated that:

[T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in th[e] case why appointment of counsel would be more likely to lead to a just determination.

*Id.* at 61–62; *cf. Cooper v. A. Sargenti Co.,* 877 F.2d 170, 172 (2d Cir.1989) ("courts should not grant such applications indiscriminately").

The flaw in Dobrowolski's argument is that before the district court is even required to make these determinations, it must first ascertain whether the litigant is able to afford or otherwise obtain counsel. *See* § 1915(d) ("The court may request an attorney to represent any such [i.e., indigent] person unable to employ counsel ..."). Because Dobrowolski does not contest the district court's finding that he had the financial ability to hire counsel, we find no basis upon which to review the district court's refusal to appoint counsel for him.

█ In any event, there is little likelihood that Dobrowolski was prejudiced by proceeding *pro se* at trial. Dobrowolski and Trapanotto had nearly identical litigation interests, and Trapanotto was represented by counsel throughout the trial. Thus, Dobrowolski, who participated in the proceedings as his own attorney, also benefitted from motions and objections made by Trapanotto's attorney, as well as the questioning and cross-examination of witnesses by that attorney.

## B. *Award of Attorney Fees.*

Section 1964(c) entitles a victorious civil RICO plaintiff to recover "the cost of the suit, including a reasonable attorney's fee" from culpable defendants. Pursuant to this provision, after the trial, Nu–Life requested that the district court award it $303,235.25 in attorney fees and $26,308.48 in costs against Trapanotto and Dobrowolski. *Nu–Life I,* 795 F.Supp. at 604–05.

Trapanotto and Dobrowolski objected to the fee request on the ground that Nu–Life failed to support its request with contemporaneous billing records that would enable them to calculate which fees were attributable to Nu–Life's successful claims against them. *Id.* at 605. In particular, they contended that they should not bear fees incurred by Nu–Life to oppose a motion for summary judgment brought by the Board in behalf of defendants other than Trapanotto and Dobrowolski, against which defendants Nu–Life ultimately did not prevail at trial. *Id.*

The district court awarded attorney fees and costs to Nu–Life, but reduced the base "lodestar" figure of $303,235.25 by $46,068.50 to account for legal work as to which no contemporaneous time records were kept, and by another $7,380 because the work in question was performed for Terminate rather than Nu–Life. *Id.* at 605–06. The court then reduced the resulting amount of $249,-786.75 by thirty percent to $174,850.00 "[d]ue to the lack of specific record keeping" as to the balance of the fees, as a result of which "it [wa]s unclear how much time was expended on the unsuccessful claims," but denied Dobrowolski and Trapanotto's additional requests that (1) the fee award be rendered proportional to the jury verdict, and (2) further reduction be made for the time spent by Nu–Life in defending against the Board's motion for summary judgment. *Id.* at 606–08.

On the latter point, the court said:

In regard to the defendants' objection to the time spent by Nu–Life in defending a summary judgment motion made by the [Board], the Court declines to parse out what portion of that defense contributed to Nu–Life's successful claims. It would be impracticable, if not impossible, for the Court to attempt to determine how, if at all, Nu–Life's response to the summary judgment motion ultimately affected its successful verdict. As the Supreme Court recognized, "the plaintiff's claims for relief will [often] involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis" (*Hensley [v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983)].

*Id.* at 607–08 (alterations partially added). Finally, the court reduced Nu–Life's request for reimbursement of costs in the amount of $26,308.48 by thirty percent to $18,415.94. *Id.* at 608.

On appeal, Dobrowolski and Trapanotto contend that no fees should have been awarded in view of Nu–Life's inadequate records, and in any event that fees were improperly awarded to Nu–Life for (1) opposing the Board's motion for summary judgment, and (2) unsuccessfully asserting civil rights claims.

The Supreme Court ruled in *Pierce v. Underwood,* 487 U.S. 552, 571, 108 S.Ct. 2541, 2553, 101 L.Ed.2d 490 (1988), that a district court's determination of the amount of an attorney fee award is reviewable only for abuse of discretion. As quoted above, Judge Spatt determined that it was nearly impossible to segregate the legal costs Nu–Life incurred opposing the summary judgment motion from the costs incurred in obtaining the verdict against Trapanotto and Dobrowolski.[2] This difficulty is not primarily due to the inadequate record keeping for which Judge Spatt had already mandated specific disallowances and an additional thirty percent reduction. Rather, as the district court pointed out, the facts and legal theories underlying the claims against Dobrowolski

---

2. The same observation can be made regarding a segregation of the work devoted to Nu–Life's RICO and civil rights claims. Further, as we discuss *infra,* Nu–Life's civil rights claims were not addressed in the trial that preceded Nu–Life's application for attorney fees.

and Trapanotto, on the one hand, and the Board and defendants, on the other hand, were thoroughly intermingled. Further, the overall thirty percent reduction was intended to compensate for any contribution of imprecise record-keeping to the difficulty of segregating the time devoted to successful and unsuccessful claims.

The Fifth Circuit held in *Abell v. Potomac Ins. Co.*, 946 F.2d 1160 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1944, 118 L.Ed.2d 549 (1992), that "[w]here time spent on unsuccessful issues is difficult to segregate, no reduction of fees is required." *Id.* at 1169 (citing *City of Riverside v. Rivera*, 477 U.S. 561, 569–74, 106 S.Ct. 2686, 2691–94, 91 L.Ed.2d 466 (1986) (plurality opinion); *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983)). We agree. In sum, in view of the disallowances and reductions that it had already made, it was not an abuse of discretion for the district court to decline any further reduction on the basis of an apportionment between claims and/or parties. Nor did the court abuse its discretion by making substantial disallowances for deficient recordkeeping, rather than directing a total denial of attorney fees and costs.

### C. *Damages for Lost Profits on Municipal Contracts.*

Of the $23,400 of injury that the jury found Nu–Life to have suffered, $6,400 was a consequence of lost profits with respect to thirty-six contracts on which Nu–Life was the apparent low bidder, but which were not awarded to Nu–Life because of the default proceedings pending against it. In accordance with § 1964(c), the court trebled the jury award, including the $6,400, in computing Nu–Life's recovery.

█ Trapanotto and Dobrowolski contend that the $6,400 injury based upon unawarded municipal contracts is not a compensable RICO injury. They base this argument upon New York law which bars an entity that submits a low bid on a public contract from any recovery of damages from a municipality for rejecting the low bid. *See, e.g., Stride Contracting Corp. v. Board of Contract and Supply*, 181 A.D.2d 876, 879, 581 N.Y.S.2d

446, 448 (2d Dep't 1992) (per curiam); *Woods Advertising, Inc. v. Koch*, 178 A.D.2d 155, 156, 577 N.Y.S.2d 22, 23 (1st Dep't 1991) (per curiam); *Spencer, White & Prentis, Inc. v. Southwest Sewer Dist.*, 103 A.D.2d 802, 803, 477 N.Y.S.2d 681, 683 (2d Dep't 1984) (per curiam); *see also Conduit & Foundation Corp. v. Metropolitan Transp. Auth.*, 66 N.Y.2d 144, 148, 485 N.E.2d 1005, 1008, 495 N.Y.S.2d 340, 342–3 (1985) (laws requiring competitive bidding for public contracts "were not enacted to help enrich corporate bidders but, rather, were intended for the benefit of taxpayers").

Unlike these cases, however, the case at bar does not involve a disappointed bidder seeking to recover lost profits from a municipality. Rather, Nu–Life seeks recovery from Trapanotto and Dobrowolski under a RICO theory based upon business injury caused by a racketeering conspiracy. While the New York Court of Appeals has explicitly stated that "[n]either the low bidder nor any other bidder has a vested property interest in a public works contract," *Conduit & Foundation Corp.*, 66 N.Y.2d at 148, 485 N.E.2d at 1008, 495 N.Y.S.2d at 343, the civil remedy provided in § 1964(c) disjunctively entitles "[a]ny person injured in his business *or* property by reason of a [RICO] violation [emphasis added]" to recover treble damages.

In the instant action, Nu–Life contended that it suffered business injury when it lost contracts it might have obtained but for the racketeering conspiracy. Recovery on this theory is not premised upon any conception of a property right in the unawarded contracts. Thus, we do not regard the district court's submission of this issue to the jury as error.

### D. *Injuries Caused by Nonpredicate Acts.*

█ Dobrowolski and Trapanotto argue that the district court erred in its charge to the jury concerning the injury causation element of a RICO conspiracy private cause of action. They assert that a conspiracy, standing alone, is insufficient to cause injury to a civil plaintiff that is compensable under § 1964(c). Rather, they contend, to maintain a private action for a RICO conspiracy, a

plaintiff must prove injury caused by a predicate act of racketeering, and not merely by the agreement to commit such acts or by an overt, nonpredicate act in furtherance of such an agreement. Dobrowolski and Trapanotto claim that the district court's instructions to the jury did not correspond with these requirements for standing under § 1964(c) to prosecute a civil action arising from a conspiracy violative of § 1962(d).

Section 1962(d) renders unlawful a conspiracy "to violate subsection . . . (c) of [§ 1962]." Section 1962(c), in turn, provides in pertinent part that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . .

A "pattern of racketeering activity" is defined as requiring the commission of at least two of the predicate acts enumerated in 18 U.S.C. § 1961(1) within a ten year period. 18 U.S.C. § 1961(5). In addition, the predicate acts must demonstrate "sufficient interrelationship and . . . sufficient continuity or threat of continuity to constitute [a prohibited] pattern." *Beauford v. Helmsley*, 865 F.2d 1386, 1391 (2d Cir.) (in banc), *vacated and remanded*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584, *adhered to*, 893 F.2d 1433 (2d Cir.) (in banc), *cert. denied*, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

■ To invoke RICO's civil remedies, a plaintiff must have been "injured in his business or property *by reason of* a violation of section 1962." § 1964(c) (emphasis added). This language has been construed to require that in order to merit standing, a civil RICO plaintiff must establish that the RICO violation at issue was a proximate cause of the

injury to the plaintiff's business or property for which redress is sought. *See Holmes v. Securities Investor Protection Corp.*, —— U.S. ——, ——, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992); *Manson v. Stacescu*, 11 F.3d 1127, 1130 (2d Cir.1993); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993); *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs.*, 985 F.2d 102, 104 (2d Cir. 1993); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993); *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990); *Sperber v. Boesky*, 849 F.2d 60, 64 (2d Cir.1988).

Dobrowolski and Trapanotto primarily rely upon *Hecht* in seeking reversal on this issue. In *Hecht*, we affirmed the dismissal of a RICO complaint brought by a discharged employee who claimed that he had been terminated because he had "blown the whistle" on mail fraud and wire fraud committed by other employees in dealing with customers' accounts. 897 F.2d at 23. We ruled that the claimed "injury must be caused by a pattern of racketeering activity violating section 1962 or by individual RICO predicate acts," *id.*, and that "the RICO pattern or acts must *proximately* cause plaintiff's injury." *Id.*

Applying this rule to Hecht's § 1962(d) conspiracy claim, we stated that "[b]ecause a conspiracy—an agreement to commit predicate acts—cannot by itself cause any injury, we think that Congress presupposed injury-causing overt acts as the basis of civil standing to recover for RICO conspiracy violations." 897 F.2d at 24. Further, because RICO's purpose "is to target RICO activities, and not other conduct," *id.*, we held that § 1962(d) "standing may be founded only upon injury from overt acts that are also section 1961 predicate acts, and not upon any and all overt acts furthering a RICO conspiracy." [3] 897 F.2d at 25. We concluded that "[b]ecause the overt act of Hecht's discharge

---

**3.** There is a division of circuit authority on the question whether § 1962(d) conspiracy standing may be premised upon injury proximately caused by overt acts that are not § 1961(1) predicate acts. *See Reddy v. Litton Indus.*, —— U.S. ——, ——, 112 S.Ct. 332, 332, 116 L.Ed.2d 272 (1991)

(White, J., dissenting from denial of certiorari); *Bowman v. Western Auto Supply Co.*, 985 F.2d 383, 386 (8th Cir.) (collecting cases), *cert. denied*, —— U.S. ——, 113 S.Ct. 2459, 124 L.Ed.2d 674 (1993).

was not a section 1961(1) predicate act, his loss of employment does not confer civil standing." 897 F.2d at 24.

In light of *Hecht,* the district court's instructions to the jury regarding injury causation for § 1962(d) liability were flawed. Judge Spatt twice instructed the jury that injury must be caused by the predicate acts or pattern of racketeering activity engaged in by the defendant, but the court added in one instance "or [by] the defendant's violations of Section 1962(c) or (d)," and in the other "or by the conspiracy to violate the RICO statute." The first formulation is at best imprecise. The second contravenes *Hecht*'s ruling that "a conspiracy ... cannot by itself cause any injury." 897 F.2d at 25.

The district court's error was not cured when, during deliberations, the court responded to a jury question seeking further enlightenment concerning the RICO conspiracy claim. The court presented a hypothetical: that if there was a conspiracy to violate RICO that was not implemented, no injury could result and no RICO claim could be brought. This language is consistent with *Hecht,* but the next passage of the instruction undermined the effect of the hypothetical:

> But if you find that the plaintiff established by a preponderance of the evidence that a defendant you are considering personally agreed to commit or aid and abet in the commission of two ... predicate acts, even if it didn't take place, enough took place to injure the plaintiff in his business, then you may find the plaintiff has established an actionable cause of action.
>
> ....
>
> ... [Y]ou can be guilty of the 1962(d) without the actual commission of the two predicate acts provided that something happened as a result of the conspiracy.... that injured [the plaintiff].

Viewing the instructions in the aggregate, despite some intimations that a wholly unexecuted conspiracy could somehow effect an injury that would result in § 1964(c) standing, they do not convey the view that liability could be premised upon a conspiracy that came to fruition only as an agreement but did not result in the infliction of any injury upon Nu–Life. As we have stated: "It is basic law that a jury charge should be examined in its entirety, not scrutinized strand-by-strand." *Warren v. Dwyer,* 906 F.2d 70, 73 (2d Cir.) (citing *Lowe v. Commack Union Free School Dist.,* 886 F.2d 1364, 1378 (2d Cir.1989), *cert. denied,* 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990)), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990).

The instructions do permit recovery, however, for injury that is caused by overt acts that are not predicate acts, and accordingly are inconsistent with *Hecht.* Further, proper objection was made to those instructions, thus preserving full appellate review. *See* Fed.R.Civ.P. 51.

We nonetheless perceive no basis for reversal. We also made it clear in *Warren* that:

> Generally, we will reverse the judgment of a trial court and grant a new trial because of an error in the jury instructions only if we are persuaded, based on a review of the record as a whole, that *the error was prejudicial* or the charge was highly confusing. *Nat'l R.R. Passenger Corp. v. One 25,900 Square Foot More or Less Parcel of Land,* 766 F.2d 685, 688 (2d Cir.1985); *Lowe,* 886 F.2d at 1378; *see* Fed.R.Civ.P. 61.

*Warren,* 906 F.2d at 73 (emphasis added); *see also Phelan v. Local 305 of the United Ass'n of Journeymen, & Apprentices of the Plumbing & Pipefitting Indus.,* 973 F.2d 1050, 1062 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993).

In this case, the jury found that the following damages had been incurred by Nu–Life and "proximately caused" by the § 1962(d) violations of Dobrowolski and Trapanotto: funds had been improperly withheld from Nu–Life for its work at P.S. 132 and P.S. 126; Nu–Life had lost profits on P.S. 132 work that it was improperly prevented from completing; and Nu–Life had also lost profits on thirty-six contracts that were improp-

erly withheld from it.[4] The immediate causes of these injuries were the retaliatory actions taken against Nu–Life as a result of its refusal to yield to the attempted extortions. These retaliatory actions were overt acts in furtherance of the § 1962(d) conspiracy, but were not § 1961(1) predicate acts.[5] Rather, the attempted extortions constituted the predicate acts.

It is clear on the facts of this case, however, that the error in the instructions was harmless because the attempted extortions proximately caused the injuries that were inflicted upon Nu–Life. Accordingly, *Hecht* does not require reversal. The attempted extortions were directed specifically at Nu–Life, and were accompanied by a clear threat that retaliation would follow if Nu–Life did not succumb. Thus, the attempted extortions were "a substantial factor in the sequence of responsible causation, and . . . [Nu–Life's injuries were] reasonably foreseeable or anticipated as a natural consequence."[6] *Hecht*, 897 F.2d at 23–24 (citing *Bonsignore v. City of New York*, 683 F.2d 635, 637 (2d Cir.1982); *Restatement (Second) of Torts*, §§ 431, 435 comment b (1965)); *see also Standardbred Owners Ass'n*, 985 F.2d at 104. The intervening, non-predicate acts of retaliation, clearly foreseen and anticipated as the virtually inevitable result of resistance to the attempted extortion, did not operate to break the chain of proximate causation that traced back to the initiating predicate acts of attempted extortion.

The facts here are obviously distinct from those that led to a different result in *Hecht*, where the dismissed allegations made it clear that the plaintiff was not a target of the § 1962(d) conspiracy, but happened upon knowledge of the conspiracy, and was discharged for threatening to disclose it. Although the link between the plaintiff's discharge and the predicate acts of mail and wire fraud directed at wholly unrelated parties was too tenuous to establish § 1962(d) liability and § 1964(c) standing in *Hecht*, the very different facts in this case require a contrary conclusion. Thus, the district court's failure to distinguish with precision between predicate and nonpredicate overt acts in its jury instructions was harmless error that does not require reversal. *See* Fed.R.Civ.P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); *cf. Farnarjian v. American Export Isbrandtsen Lines*, 474 F.2d 361, 362 (2d Cir. 1973) (although jury instruction concerning proximate cause was incorrect, no prejudice to substantial rights shown, judgment affirmed).

## II. THE CROSS–APPEAL

Because some of the defendants were sued only by Terminate Control Corp., *see supra* note 1, the action was withdrawn against John Does 1–20, and the district court dismissed the RICO claims against the Board and the DSB in *Nu–Life II*, only Nu–Life's

---

**4.** It is inconsequential that the jury found Dobrowolski and Trapanotto liable under § 1962(d), but not under § 1962(c). A § 1962(c) violation requires the commission of the requisite predicate acts, while a § 1962(d) violation requires only an agreement to commit the requisite predicate acts, followed by the commission of *a* predicate act that proximately causes injury to the plaintiff. In any event, even if we were to regard the jury verdicts as inconsistent on the facts of this case, the inconsistency would provide no basis for reversal. *See United States Football League v. National Football League*, 842 F.2d 1335, 1353 n. 17 (2d Cir.1988); *Globus v. Law Research Serv., Inc.*, 418 F.2d 1276, 1290 n. 17 (2d Cir.1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970).

**5.** Section 1961(1)(B) lists as a predicate act "any act which is indictable under [18 U.S.C.] . . .

section 1951 (relating to interference with commerce, robbery, or extortion)." Section 1951(a) criminalizes, *inter alia*, any attempt "to obstruct[ ], delay[ ], or affect[ ] commerce . . . by . . . extortion." Section 1951(b)(2) defines "extortion" to mean "the *obtaining of property* from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right [emphasis added]." Thus, because it does not constitute *obtaining* (or *attempting to obtain*) property, retaliation against an entity that resists an attempted extortion does not come within the confines of § 1951, and therefore does not constitute a RICO predicate act.

**6.** The verdict sheet in this case used substantially this language in instructing the jury as to the damages to be awarded in the event that it found a violation of § 1962(c) or (d).

RICO claims against Dobrowolski, Trapanotto, and Borg went to the jury. As we consider in detail *infra, see* part II(c)(1) of this opinion, the civil rights claims in Nu–Life's fourth amended complaint were asserted only against the Board and (arguably) the individual defendants named therein.[7]

Nu–Life cross-appeals, contending that the district court's jury instructions improperly limited the pool of predicate acts that the jury could consider in determining the liability of Dobrowolski and Trapanotto under § 1962(c), and of Borg under § 1962(d). Nu–Life's cross-appeal also challenges the summary judgment dismissing its fourth amended complaint.

### A. The Predicate Acts Instruction.

█ Nu–Life contends that the district court erred when it chose to exclude from the jury's consideration any predicate acts committed by Dobrowolski, Trapanotto, and Borg unless they were committed against Nu–Life. Nu–Life points out that the district court limited in this manner the pool of predicate acts that the jury could consider in determining whether, with respect to the § 1962(c) claims asserted against them, Dobrowolski and Trapanotto had participated in "a pattern of racketeering activity" within the meaning of § 1962(c).

In its instruction and verdict sheet, the court specified the predicate acts that could be considered by the jury to find a § 1962(c) violation, but included only those acts alleged to have been directed against Nu–Life. Counsel for Nu–Life timely objected to this instruction, contending that the jury was entitled to consider all predicate acts committed by Dobrowolski and Trapanotto regardless of the victim or target of those acts.

We have not yet opined on this precise issue, but the Third and Seventh Circuits have held that a pattern of racketeering activity may be based upon predicate acts directed against nonplaintiffs as long as one act injures the plaintiff so as to create standing for that plaintiff. *See Kearny v. Hudson Meadows Urban Renewal Corp.,* 829 F.2d 1263, 1268 (3d Cir.1987); *Marshall & Ilsley Trust Co. v. Pate,* 819 F.2d 806, 809–10 (7th Cir.1987).

This appears to be a correct reading of § 1964(c), which accords standing to "[a]ny person injured in his business or property by reason of a violation of section 1962." We need not resolve the issue, however, because any error in the jury instructions on this question was harmless. Nu–Life achieved a recovery against Dobrowolski and Trapanotto under § 1962(d). The elements of damages set forth in the verdict sheet were identical for § 1962(c) and (d). Any predicate acts directed against parties other than Nu–Life did not cause injury to Nu–Life. Accordingly, any error in the district court's instruction on this issue did not "affect the substantial rights" of Nu–Life. Fed.R.Civ.P. 61.

█ No error occurred as to Borg. Borg was not charged with a substantive RICO offense, but only with participating in a RICO conspiracy. Unlike the portion of the jury instructions relating to the substantive RICO offenses, Judge Spatt did not limit the acts that the jury could consider in deliberating upon the RICO conspiracy claims. At the time of the charge, moreover, it had been established that the RICO substantive claims would be treated differently from the RICO conspiracy claims. During an earlier charge conference, in addressing how the allegations against Borg would be charged to the jury, Judge Spatt stated that "[a]s far as what predicate acts, I don't have to charge the jury on the conspiracy to personally commit named predicate acts, as long as it is two predicate acts. I don't have to name those predicate acts." And at a subsequent conference, Judge Spatt said: "There is enough evidence in my opinion to go to the jury on conspiracy to violate 1962(c) because of [Borg's] prior involvement in the Signet Gerace situation...."

The "Signet Gerace" situation refers to evidence that Borg was involved in enforcing kickback demands against a contractor that

---

7. In addition to the Board, the DSB, Dobrowolski, Trapanotto and Borg, Stuart Horowitz, John J. Manfredi, John Frisone, and John Does 1 through 20 were named as defendants in the fourth amended complaint.

was not a party to this action. Thus, Judge Spatt clearly contemplated that the pool of predicate acts to be considered as to the RICO conspiracy claims would not be limited to acts targeting only Nu–Life. Finally, the verdict sheet listed specific predicate acts (attempted extortions of Nu–Life and a conspiracy to extort Nu–Life) for the jury to address with respect to the § 1962(c) claims against Dobrowolski and Trapanotto, but included no such listing with respect to the § 1962(d) claims against Dobrowolski, Trapanotto, and Borg.

B. *Nu–Life's § 1983 Claims Against the Board.*

■ Nu–Life's fourth amended complaint contains a single count alleging denial of its constitutional rights by the Board in violation of 42 U.S.C. § 1983. According to that complaint, the kickback scheme that led to Nu–Life's injuries was "systematic and involved a custom, usage, practice and policy uniform throughout the [DSB], which involved acquiescence, knowledge, assistance and control at the supervisory level of the [DSB]." Judge Spatt granted summary judgment dismissing the § 1983 claims against the Board on the basis that Nu–Life presented no evidence that the alleged constitutional harms suffered by Nu–Life resulted from a policy or custom of the Board. Nu–Life contests this dismissal, arguing that the district court ignored evidence that created an issue of fact as to the Board's role in the kickback scheme.

Section 1983 creates a private right of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court ruled that:

> Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies ... where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

436 U.S. at 690–91, 98 S.Ct. at 2035–36 (footnotes omitted).

Since *Monell,* the Court has attempted to clarify the circumstances under which the acts or omissions of municipal employees will constitute an official policy or custom. In *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion), the Court stated that "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability," *id.* at 123, 108 S.Ct. at 924 (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986) (plurality opinion)), and that "the identification of policymaking officials is a question of state law." *Id.* 485 U.S. at 124, 108 S.Ct. at 924. The *Praprotnik* plurality reasoned that "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Id.* at 126, 108 S.Ct. at 925.

Justices Brennan, Marshall, and Blackmun, in an opinion concurring in the judgment, criticized the plurality's focus on state law as "formulaic and unrealistic." *Id.* at 143, 108 S.Ct. at 934 (Brennan, J., concurring in the judgment). They argued that "state law will naturally be the appropriate starting point, but ultimately the factfinder must determine where such policymaking authority actually resides, and not simply 'where the applicable law purports to put it.'" *Id.*

(quoting the plurality opinion, *id.* at 126, 108 S.Ct. at 925).

One term later, however, in *Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), a Supreme Court majority (the *Praprotnik* plurality plus Justice Kennedy, who did not participate in *Praprotnik* ) expressly adopted the *Praprotnik* plurality's reasoning that the issue of final policymaking authority is a legal issue to be determined on the basis of state law rather than a factual issue to be decided at trial. The Court held that:

> In *Praprotnik*, the plurality reaffirmed the teachings of our prior cases to the effect that "whether a particular official has 'final policymaking authority' is a question of *state law*." *Id.,* 485 U.S. at 123, 108 S.Ct. at 924 (emphasis in original), quoting *Pembaur,* 475 U.S., at 483, 106 S.Ct. at 1299 (plurality opinion). As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury. Reviewing the relevant legal materials, including state and local positive law, as well as " 'custom or usage' having the force of law," *Praprotnik, supra,* 485 U.S. at 124, n. 1, 108 S.Ct. at 924, n. 1, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, *see Monell,* 436 U.S., at 661, n. 2, 98 S.Ct., at 2020, n. 2, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity. *See Pembaur, supra,* 475 U.S.

at 485–487, 106 S.Ct. at 1301–1302 (WHITE, J., concurring).

491 U.S. at 737, 109 S.Ct. at 2724.

In accordance with *Jett,* Judge Spatt noted that New York Education Law § 2590–g explicitly vests all final policymaking authority with the Board, *see Nu–Life II,* 809 F.Supp. at 179, not with the DSB, Borg, Dobrowolski, Trapanotto, nor even with the Chancellor of the Board. *See id.* at 178–79.

The fourth amended complaint does not make specific allegations against the Board, but instead only names Board agents such as the DSB and the individual defendants. The allegations in Nu–Life's fourth amended complaint are stated in terms of "the Board, through its [DSB]," and "a custom, usage, practice and policy uniform throughout the [DSB], which involved acquiescence, knowledge, assistance and control at the supervisory level of the [DSB]." *Monell* and *Jett* reject this sort of *respondeat superior* theory. Judge Spatt accurately described the record in pointing out the absence of evidence:

> (1) that the Board itself was involved in the kickback scheme; (2) that it contributed to the length of the Board of Review process; (3) that any Board member played any role in the conduct at issue, (4) that any Board member knew of the illegal activity with regard to Nu–Life, or (5) that any Board member had any knowledge or involvement in the extortion scheme.

*Nu–Life II,* 809 F.Supp. at 179.

Further, although the kickback scheme appears to have been widespread within parts of the DSB, we perceive no basis to conclude that the Board was deliberately indifferent to it, *see Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993) (collecting cases), or that the kickback scheme was " . . . so manifest as to imply the constructive acquiescence" of the Board in that scheme. *Sorlucco v. New York City Police Dep't.,* 971 F.2d 864, 871 (2d Cir.1992) (citing *Praprotnik,* 485 U.S. at 130, 108 S.Ct. at 927); *Krulik v. Board of Educ.,* 781 F.2d 15, 23 (2d Cir. 1986)).

Finally, there was considerable evidence that contravened any claim of Board indiffer-

ence or acquiescence. For example, James FitzGerald, the Board's Deputy Inspector General, testified that "the first second [Borg] has an idea there might be corruption, it is his responsibility in the Board of Ed instructions, SOPM, which is a manual, Standard Operating Procedures, to report it immediately to the Inspector General and his staff." FitzGerald and Michael Sofarelli, the Inspector General, testified that Borg did in fact report Nu–Life's complaints to the Inspector General's office. Thus, even if there was a factual issue concerning Borg's involvement in the kickback scheme, there was no factual dispute that the Board demanded that notification of any possible corruption at the DSB be made to the Inspector General's office for investigation. There was also no factual dispute that regardless of Borg's possible involvement, the Board pursued the corruption allegations reported by Nu–Life.

The investigation by the Inspector General's office included the placing of an undercover officer in the Brooklyn area office of the DSB in a sting operation in conjunction with the Kings County District Attorney's Office. The investigation led to the indictment of Dobrowolski and Trapanotto, as well as other DSB inspectors.

Based upon the foregoing, we affirm the district court's grant of summary judgment dismissing Nu–Life's fourth amended complaint against the Board.

C. *Nu–Life's § 1983 Claims Against Individual Defendants.*

*Monell* and *Jett* render a substantive analysis of the constitutional violations alleged in Nu–Life's civil rights claims against the Board superfluous. To the extent, however, that Nu–Life's fourth amended complaint may be deemed to state such claims against individual defendants, *see supra* note 7, those claims are still before us. Before addressing these claims on their merits, we first note our uncertainty as to whether § 1983 claims against individual defendants are properly in the case at this juncture.

1. *Whether § 1983 Claims Are Now Pending against Individual Defendants.*

The fourth amended complaint names a number of individual defendants. Fairly read, however, it asserts § 1983 claims solely against the Board. The allegations of the complaint are grouped under four general headings: (1) "Jurisdiction and Venue," (2) "Personnel," (3) "General Allegations," and (4) "As and For Plaintiff Nu–Life's Claims *against Defendant Board* [emphasis added]." The headings are an accurate depiction of the ensuing text. Further, only the Board moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12 and 56. *See Nu–Life II,* 809 F.Supp. at 173. After granting that motion on *Monell/Jett* grounds, *id.* at 177–82, the court went on to address and reject "claims made against the individual defendants named in the complaint," *id.* at 182–84, stating as a reason for doing so that "the parties fully briefed the First Amendment, Due Process, and Equal Protection claims." *Id.* at 185. In addition, the substantive § 1983 issues were fully briefed on appeal, but this would be appropriate even if only the Board were a § 1983 defendant (guarding against the possibility that the district court's *Monell/Jett* ruling would be reversed).

We note also that in a letter to Judge Spatt dated June 24, 1992, following the completion of the RICO trial and the filing of Nu–Life's fourth amended complaint, Eliot R. Clauss, then-counsel for Trapanotto, requested that Judge Spatt correct his memorandum decision and order dated June 16, 1992, which read in pertinent part: "During the trial the court granted the motion by Nu–Life to amend the complaint to add a cause of action under 42 U.S.C. § 1983 against *all the defendants* [emphasis added]." Clauss' letter asserts the belief that the quoted statement "is in error," adding:

Nu–Life's motion for leave to amend the complaint, submitted in December, 1991, sought to add a civil rights claim only against the Board of Education, not all defendants. Though Nu–Life had made two prior motions seeking to add civil rights claims against *all* defendants, which were denied, on the eve of trial, in the wake of this Court's decision dismissing the RICO claims against the municipal defendants, Nu–Life's third motion to amend

sought to add a civil rights claim *only* against the Board of Education.

In view of this history, it appears that the motion granted by the Court was Nu–Life's third-motion to add a civil rights claim only against the Board. Thus, the trial to take place in September, 1992 involves Nu–Life's civil rights claim against the Board of Education, not against any other defendant.

I have discussed this matter with Mr. Woods from the Corporation Counsel's office and Mr. Graifman [Nu–Life's counsel], and each of them is in agreement with this correction being made.

These representations are supported by the transcript of the hearing on February 28, 1992 at which Judge Spatt granted the motion to file the fourth amended complaint. At that hearing, Judge Spatt "grant[ed] [Nu–Life's] motion to amend its complaint to add its civil rights claims against the [Board] and the [DSB]." As far as we can ascertain, however, Judge Spatt took no action directly responsive to Clauss' letter.

Given this ambiguity, and the already protracted course of this litigation, we deem it appropriate to address the § 1983 claims against the individual defendants, especially because we believe that one of those claims is not subject to dismissal on summary judgment, as will appear *infra*. We will then remand for the district court to determine whether any § 1983 claims against individual defendants remain in the case, and if so, for further proceedings on the claim that we deem viable.

### 2. *Alleged Constitutional Violations.*

■ Nu–Life contends that it was deprived of property without due process of law[8], and that the discriminatory retaliation inflicted upon Nu–Life denied it the equal protection of the laws. These claims relate to the previously described allegations of re-taliatory conduct by employees of the DSB against Nu–Life in response to Nu–Life's (1) failure to comply with extortion demands, and (2) "blowing the whistle" to investigative and prosecuting authorities, as well as the media, regarding the kickback scheme.

We agree with Judge Spatt's rejection of Nu–Life's procedural due process arguments. Nu–Life contends that it suffered deprivations of its property rights as a result of the Board's failure of payment and performance due to Nu–Life on existing and future DSB contracts. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Such property entitlements ordinarily derive from state law. *Id.* In *S & D Maintenance Co. v. Goldin*, 844 F.2d 962, 967–70 (2d Cir. 1988), we ruled that New York state law and pertinent contractual provisions did not give a city contractor a property right in the continuation of or prompt payment on its contract pending investigation of the contractor to determine whether the contract was void. In the instant case, Nu–Life's contracts with the DSB grant the Board considerable discretion with respect to the approval of, and payment for, Nu–Life's work. In view of this discretion, as in *S & D Maintenance*, we find that Nu–Life had no property right in immediate payment or continuation of existing DSB contracts pending a determination by the Board of Review regarding whether Nu–Life was in default on its DSB contracts. *See Christ Gatzonis Electrical Contractor, Inc. v. New York City Sch. Constr. Auth.*, 23 F.3d 636, 639–641 (2d Cir. 1994).

■ Nor does Nu–Life have a property right in lost profits from future DSB con-

---

8. Nu–Life claims a deprivation of procedural due process, but its appellate brief also makes passing reference to substantive due process, citing our opinion in *Brady v. Town of Colchester*, 863 F.2d 205, 216 (2d Cir.1988) (deprivation of property interest "because of indefensible reasons such as impermissible political animus" constitutes substantive due process violation). In the factual context of this case, the substantive due process analysis is duplicative of the equal protection analysis undertaken *infra*. Cf. *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 46 (1st Cir.1992) (claim of political retaliation more properly considered as First Amendment violation than as Fourteenth Amendment substantive due process violation).

tracts that were allegedly denied to Nu–Life because of the institution of board of review proceedings against it. *See supra* part I(C) of this opinion (bidders lack property rights in future contracts to be awarded under competitive bidding procedures).

■ Nu–Life does have a property right, however, in ultimately being paid for work properly performed under the DSB contracts. *See Christ Gatzonis,* 23 F.3d at 639; *General Elec. Co. v. New York State Dep't of Labor,* 936 F.2d 1448, 1453 (2d Cir.1991); *Signet Constr. Corp. v. Borg,* 775 F.2d 486, 489 (2d Cir.1985). The issue then becomes the process due Nu–Life under the Fourteenth Amendment. In *Signet,* given the nature of the property right at issue, and the administrative burden that would be imposed by a requirement of predeprivation hearings, we were satisfied that:

> [T]he combination of (1) informal exchanges before the alleged excessive withholding of monies claimed to be due, (2) the formal proceedings required before Signet could be declared in default and ineligible to bid on further contracts for three years, and (3) the availability of state court remedies for review of alleged improper Board action, which were in fact utilized by Signet, was adequate to insure Signet due process in accordance with the Fourteenth Amendment.

*Id.* at 492. Nu–Life was entitled to, and engaged in, the same procedures.[9] Thus, as did the contractor in *Signet,* Nu–Life received all the process due it under the Fourteenth Amendment.

We disagree, however, with the district court's dismissal of Nu–Life's equal protection claim. *See Nu–Life II,* 809 F.Supp. at 184. In its ruling on that issue, the district court invoked our opinion in *FSK Drug Corp. v. Perales,* 960 F.2d 6, 10 (2d Cir.1992), but summarily concluded that "[t]he factual situation in this case does not come within the purview" of the *FSK* ruling. *Nu–Life II,* 809

F.Supp. at 184. We view the situation differently.

In *FSK,* we explained that an equal protection violation based upon selective application of a facially lawful state regulation is properly found when:

> (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. *Wayte v. United States,* 470 U.S. 598, 608–09, 105 S.Ct. 1524, 1531–32, 84 L.Ed.2d 547 (1985); *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981).

*FSK,* 960 F.2d at 10.

Nu–Life's fourth amended complaint adequately alleges selective treatment both (1) in retaliation for the exercise of its First Amendment rights, and (2) motivated by a malicious or bad faith intent to injure Nu–Life. Thus, the question presented on this appeal is whether the extensive record in this case, including the evidence presented at the RICO trial, reflects a "genuine issue as to any material fact," Fed.R.Civ.P. 56(c), with respect to Nu–Life's allegations of invidiously motivated selective treatment.

■ We review the district court's dismissal pursuant to Rule 56 *de novo. Syverson v. Consolidated Rail Corp.,* 19 F.3d 824, 825 (2d Cir.1994) (citing *Miner v. City of Glens Falls,* 999 F.2d 655, 661 (2d Cir.1993)). A party is entitled to summary judgment "only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact." *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990) (collecting cases). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson*

---

**9.** Nu–Life succeeded in overturning, as arbitrary and capricious, a Board determination that Nu–Life had "willfully and in bad faith violated a contract and delayed the performance and completion of the work pursuant to that contract."

*Nu–Life Construction Corp. v. Board of Review of the Bd. of Educ.,* 161 A.D.2d 765, 765, 556 N.Y.S.2d 360, 361 (2d Dep't) (per curiam), *appeal denied,* 76 N.Y.2d 711, 564 N.E.2d 672, 563 N.Y.S.2d 62 (1990).

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The record in this case amply establishes genuine issues of material fact as to whether the individual defendants named in Nu–Life's fourth amended complaint singled out Nu–Life for selective, injurious treatment (1) in retaliation for its exercise of First Amendment rights, or (2) with a malicious or bad faith intent to injure Nu–Life. Nu–Life's complaints to investigative and prosecutorial authorities fall clearly within its First and (derivative) Fourteenth Amendment right to petition the government for a redress of grievances. *See Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir. 1994); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). We are aware, of course, that the individual defendants contend that Nu–Life's problems resulted from poor performance of its contractual obligations, rather than invidiously selective action by those defendants. This factual controversy should be resolved by the trier of fact, not on a motion for summary judgment.

We note that the district court addressed Nu–Life's fourth amended complaint as attempting to state an independent First Amendment claim, and rejected that claim on the basis that "the institution of a Board of Review proceeding involving a government contractor, which is a form of due process, does not constitute a violation of the contractor's First Amendment rights." *Nu–Life II,* 809 F.Supp. at 182 (citations omitted). As we have indicated, however, the conduct of such proceedings in an invidiously selective manner, in retaliation for the exercise of First Amendment rights, constitutes an equal protection violation that will sustain a § 1983 claim.

In addition, the evidence of retaliatory action presented by Nu–Life went beyond the institution of Board default proceedings. Nu–Life produced testimony by an investigator for the Kings County District Attorney and a DSB employee that DSB employees planned to damage Nu–Life through selective "white glove" inspections of Nu–Life's work. Nu–Life also presented evidence that it had been subjected to work sabotage by DSB employees.

Thus, we conclude that if, by the time *Nu–Life II* was decided dismissing Nu–Life's fourth amended complaint, Nu–Life had asserted and not subsequently waived § 1983 civil rights claims against the individual defendants named in that complaint, the district court erred in failing to allow Nu–Life's equal protection claim to go to trial.

### Conclusion

We affirm the judgment against Dobrowolski and Trapanotto and the summary judgment dismissing Nu–Life's fourth amended complaint, and affirm the dismissal of the due process claim arguably stated in Nu–Life's fourth amended complaint against the individual defendants named therein. We vacate the dismissal of the equal protection claim arguably stated in Nu–Life's fourth amended complaint against the individual defendants named therein, and remand for the district court to (1) determine whether this claim remains in the case, and if it does, (2) to conduct further proceedings with respect to that claim not inconsistent with this opinion. The parties shall bear their own costs.